**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1554-18
              A-2739-18
              A-3183-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DAIQUAN C. BLAKE,

      Defendant-Appellant.
_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ROBERT F. BLAKE,

      Defendant-Appellant.
_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ROBERT F. IVERSON,
a/k/a ROBERT F. BLAKE,
and ROBERT IVERSON,

        Defendant-Appellant.

_____

Argued (A-1554-18) January 13, 2022, Argued (A-2739-18) February 3, 2022, and Submitted (A-3183-18) January 13, 2022 – Decided February 17, 2022

Before Judges Mawla and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-03-0259.

Douglas R. Helman, Assistant Deputy Public Defender, argued the cause for appellant Daiquan C. Blake (Joseph E. Krakora, Public Defender, attorney; Douglas R. Helman, of counsel and on the briefs).

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant Robert F. Blake (Joseph E. Krakora, Public Defender, attorney; Alison Gifford, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Robert F. Iverson (Monique Moyse, Designated Counsel, on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Regina M. Oberholzer, of counsel and on the briefs).

PER CURIAM

In these three back-to-back appeals, defendants Daiquan C. Blake, Robert F. Blake, and Robert F. Iverson appeal from their convictions and sentences related to the shooting and death of Juanita Holley outside the home she shared with her husband, Reggie Holley.[1]  We affirm the convictions of all three defendants, the sentences of Robert[2] and Iverson, and remand for Daiquan's resentencing.

In September 2016, Daiquan was invited to a baby shower for his ex-girlfriend Sianni Powers at Reggie and Juanita's home in Bridgeton.  Daiquan arrived at approximately 1:00 p.m.  At the shower, Daiquan had an argument with Marvin Sharpe, Powers' sister's boyfriend.  Reggie intervened and asked both men to leave.  Daiquan used Powers' phone to find a ride home by using her Facebook account to message his own account, which was being used by his then-girlfriend, stating:  "This Dai, I'm good.  I gotta get my gun."

Daiquan's cousin picked him up and drove him home to Penns Grove.  Later the same day, at approximately 7:00 p.m., Dianna Carlson drove Daiquan

---

[1]  Because Juanita and Reggie share a surname, we refer to them by their first names.  We intend no disrespect.

[2]  Because Daiquan and Robert share a surname, we refer to them by their first names.  We intend no disrespect.

and his sister Hyshonna[3] back to the Holley residence. Carlson followed a minivan driven by Iverson, Daiquan's father, with Daiquan's brothers, Robert and Isaiah Harris as passengers. After parking down the street from the Holley home, Carlson and Hyshonna exited Carlson's car and stood outside. Daiquan's brothers then walked up to Carlson and Hyshonna.

Daiquan knocked on Reggie's door and asked to speak with Powers, but Reggie informed him she was not there. Reggie believed Daiquan was searching for Sharpe. Daiquan returned to Carlson's car. Reggie then called his friend, Bruce Hall, who was coming to buy a car, and asked Hall to bring his gun. When Hall arrived approximately fifteen minutes later, Reggie walked outside to meet him. When Carlson and Hyshonna observed Hall's vehicle pull up, they returned to Carlson's car. Shortly thereafter, Carlson stated she saw Daiquan and his brothers running and then heard gunshots.

Harold Govan, Reggie's neighbor, was sitting with his wife on their porch when the shooting took place. He told police he saw three men running down the street and into a bush. He then saw one of the men walk into the middle of the street and shoot toward the Holley residence.

---

[3] Hyshonna shares a surname with Daiquan and Robert. For these reasons, we refer to her by her first name. We intend no disrespect.

Reggie identified Daiquan as the shooter. When he saw Daiquan shoot, he ducked and tried to turn around, but tripped over Juanita's body. She had followed him outside and was struck by a bullet in the chest. She later died at the hospital.

Police canvassed the scene and recovered several projectiles. Based on the evidence, they concluded there were two shooters: Daiquan and Hall.

A few hours after the shooting, State Police detectives John Weber and C.J. Tortella questioned Daiquan regarding the incident. The recorded interview lasted approximately an hour. After reading Daiquan his Miranda[4] rights and confirming he understood them, Daiquan signed a Miranda waiver card. Daiquan continued speaking to the detectives.

The interview recording was played for the jury. In it, Daiquan claimed he left the baby shower because the party was over. He later admitted arguing with Sharpe at the party but claimed they "talked it out[.]" He stated he returned with the others to drop off gifts for Powers, and when he knocked on Reggie's door, Reggie "started coming crazy." Daiquan claimed he left after Reggie told him Powers was not there.

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1554-18

Daiquan denied shooting a gun, but claimed that shortly after he argued with Reggie, another car pulled up and "somebody" started shooting. He was scared and ran until he borrowed a phone from somebody on the street to call his sister. The interview concluded when Daiquan asked to speak with a lawyer.

A few minutes later, Daiquan asked to speak with police again. Detective Sergeant Joseph Itri and Lieutenant Thomas Wieczerak conducted the second interview, which was also recorded, after re-Mirandizing Daiquan. He admitted Reggie asked him to leave the party because of the altercation and admitted Robert was present at the scene. The second interview ended when Daiquan asked to speak to his mother.

Police also Mirandized and interviewed Carlson. She stated Hyshonna told her Daiquan "went to the baby shower and they tried to jump him." Carlson stated Daiquan told her when he knocked on Reggie's door, he told Reggie "I want my fair one because you all tried to jump me. I want my fair one. Can you come outside?" Daiquan also told her, "they started shooting first and that's when he said he let one . . . . He shot once." She did not see Daiquan's gun but heard two guns during the shooting.

Daiquan was indicted on: first degree murder, N.J.S.A. 2C:11-3(a)(1) (count one); second degree possession of a weapon for an unlawful purpose,

N.J.S.A. 2C:39-4(a)(1) (count two); second degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count three); fourth degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (count four); and second degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:12-1(b)(1) (count five). Robert, Iverson, and Harris were each indicted on a single count of second degree conspiracy to commit aggravated assault, attempting to cause serious bodily injury, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:12-1(b)(1).

The trial judge denied Daiquan's motion to suppress his statements to police after considering testimony from Weber and Itri. The judge concluded Daiquan voluntarily re-initiated communication with the police after terminating the first interview and both of his statements were given after a knowing and voluntary waiver of his rights.

Harris, Iverson, and Robert's cases were severed from Daiquan's. At Daiquan's trial, the jury heard testimony from, among others: Powers, Govan, Carlson, and Reggie. The State played Daiquan's first interview for the jury in its entirety as well as portions of his second interview.

No gun was recovered from Daiquan's home. Police did recover a P38 semiautomatic pistol from Hall's home and determined it matched some of the

shell casings found. However, no gun was ever found that matched the projectile found in Juanita's body.

Govan testified he saw three males "coming down the street" from Reggie's house. One man was wearing a gray hoodie and the other two "had black hoodies on[.]" He saw the group run to a bush and overheard one of the men say, "F that, I'm not running." The man walked into the street, reached into his pants, pulled out a gun and fired towards the Holley home. Govan then heard gunfire coming from "down the street" in response. Afterwards, the group ran down the street and jumped in a van. He also saw another vehicle speeding away from the area.

Carlson testified she did not see Daiquan with a gun. Contrary to her initial statement to police, she denied Daiquan ever told her he shot a gun and claimed police pressured her to make the statement during her interview. Given her inconsistent testimony, the State sought to play her police interview for the jury. The trial judge held a Gross[5] hearing at which Weber testified he interviewed Carlson and she voluntarily provided her statement. The judge concluded Carlson's recorded statement was reliable and therefore could be presented to the jury as a prior inconsistent statement pursuant to N.J.R.E.

---

[5]  State v. Gross, 121 N.J. 1 (1990).

803(a)(1). After rendering the decision, the judge inquired whether the parties wished to redact portions of the recording before it was played for the jury; neither raised an objection.

Reggie testified he heard Daiquan arguing with Sharpe at the shower and told them both to leave. Reggie stated Daiquan left for "a couple [of] hours" before returning looking for Sharpe, asking Reggie "[w]here he at now?" Reggie responded Sharpe was not there and was "long gone." Undeterred, Daiquan responded "[w]ell, it started here and it's gonna . . . finish."

Reggie also testified when Hall called him about coming to look at a car Reggie was selling, he warned him to "be careful . . . because that young boy is still out here acting stupid . . . ." He also advised Hall to "bring [his gun] just in case." Approximately fifteen minutes later, Reggie walked outside holding "a BB gun" to meet Hall. Reggie saw Daiquan sitting in a car parked about two-hundred feet up the street, and then heard someone say "[h]e brung in some people." He then heard a gunshot, ducked, turned around, and found Juanita on the ground. Reggie told Hall Juanita was hit and then Hall "got back in his truck and start[ed] shooting." Reggie heard Hall shoot back about "four or five" times.

Although Reggie did not know Daiquan's first name and the shower was the first time the two met, he identified Daiquan as the shooter because he could

A-1554-18

see him "[v]ery well [because] [h]e had just left [his] porch." He testified Daiquan wore a red or rust colored shirt to the shower but returned wearing a hoodie.

The jury convicted Daiquan on counts one through four with count one amended to second degree passion/provocation manslaughter. At sentencing, the trial judge found no mitigating factors. The judge found aggravating factors three and nine, N.J.S.A. 2C:44-1(a)(3) and (9), giving both factors "substantial weight."

The judge merged count two into count one and sentenced Daiquan to ten years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He also merged count four into count one. On count three, the judge sentenced Daiquan to ten years pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), and subject to five-years of parole ineligibility. After analyzing the Yarbough[6] factors, the judge determined counts one and three would be served consecutively.

Following Daiquan's conviction, Harris pled guilty and Robert and Iverson's case was tried before a jury, presided over by the same judge as Daiquan's trial. Prior to the trial, Iverson moved to suppress two statements he had given police following Daiquan's arrest. The first statement was a recording

---

[6] State v. Yarbough, 100 N.J. 627 (1985).

made in Iverson's home, which the judge found admissible because police were questioning Iverson as a witness and not as a suspect. This statement was played for the jury and Iverson does not challenge it on appeal.

The second was a formal video statement taken at State Police barracks the next morning. At the outset of the recording the following took place:

> [WEBER:] . . . Before we start . . . I have to advise you of your rights okay. You're not under arrest at this time.
>
> [IVERSON:] Yea.
>
> [WEBER:] But I'm . . . going to read it to you anyway.
>
> [IVERSON:] Uh huh.
>
> [WEBER:] And then you can just indicate that you'll understand as I'm . . .
>
> [IVERSON:] Should I have my lawyer present with me with this?
>
> [WEBER:] Do you feel like you need a lawyer here? I mean . . .
>
> [IVERSON:] I don't feel (indiscernible as both . . . Weber [and] Iverson speaking at the same time). (laughs) You talking about reading me my rights.
>
> [WEBER:] . . . [L]ike I said . . . it's something I . . . have to do okay.
>
> [IVERSON:] Alright.

A-1554-18

The trial judge found Weber's testimony at the Gross hearing credible. The judge found Iverson's second statement was knowing and voluntary because Iverson did not request counsel. He further found Weber's statement was appropriate because it was not made to dissuade Iverson, and when asked if he felt he needed counsel, Iverson responded "no." The judge concluded "the tenor and the content" of Iverson's statements showed he was "familiar with how police investigations go. He says he understands, he knows what they're doing. That they have to do what they're doing." At trial, the second statement was not played for the jury and was instead briefly mentioned during the State's case, as we will discuss.

Carlson, Reggie, and Govan testified similarly in Robert and Iverson's cases as in Daiquan's case. Carlson explained Hyshonna called her to ask if she wanted to give people a ride. Carlson arrived at the Iverson home around 6:00 p.m. Iverson and Daiquan asked her to drive them back to the Holley home after a "discussion about returning back to the location where [Daiquan] was earlier that day[.]" Carlson believed the group was only going to Reggie's for Daiquan to fight Sharpe one-on-one. She testified Daiquan brought his brothers and father "to make sure it was a fair fight."

12

When they arrived, Carlson, Hyshonna, and Daiquan got out of Carlson's car, and were joined by Harris and Robert. The group talked and "stood around." Harris and Daiquan then approached Reggie's door while Robert stayed by the car. When they returned, Harris told Carlson and Hyshonna to get back in the car because another car was approaching. Carlson testified that during the shooting Robert was in front of her car. Carlson and Hyshonna left the scene and later met up again with Harris, Daiquan, Iverson, and Robert.

Govan testified he saw two men with hoods on walk down the street. He saw one of them walk past his home to meet someone and then come back with a third man. The three men were walking towards Reggie's home when something startled them, causing them to run. Govan then said, "they ran right past [a] bush and then . . . one said; 'F that,' and went back [into the street] and reached in his pants . . . and shot." He saw the men run away and jump in a van, followed by Carlson's car speeding away.

Iverson's neighbor, Keyla Parrilla Caballos, testified she owned a Mazda minivan, which the group borrowed that day. She could not identify which son asked to borrow the vehicle, but believed Iverson was the driver.

State Police Sergeant John DeHart and Weber also testified. DeHart spoke with Iverson the evening of the shooting, and Iverson denied the family

13

ever left the house. Weber explained he obtained cell phone location data for Iverson, Daiquan, Hyshonna, and Carlson.

The State also called State Police Detective Sergeant Steven Foster as an expert witness. He analyzed Iverson, Hyshonna, and Robert's cell phones. Using cell-tower data, he located Robert halfway between Penns Grove and Bridgeton at around 6:40 p.m. He testified Robert made four calls within that area after 8:00 p.m. in the evening, three of those calls were made to Carlson between 8:00 and 8:01 p.m. According to Foster, Robert left Bridgeton and returned to Penns Grove at 8:58 p.m. Foster also located Iverson's cell phone in Penns Grove at 9:10 p.m.

After the State rested, the trial judge denied Robert and Iverson's motions for acquittal. The jury convicted both men on the sole count in their indictments. The judge denied each defendant's motion for a new trial.

At Robert's sentencing, the trial judge found aggravating factors three and nine, N.J.S.A. 2C:44-1(a)(3) and (9), and gave both substantial weight, and found mitigating factor thirteen, N.J.S.A. 2C:44-2(b)(13). The judge concluded the aggravating and mitigating factors were in equipoise and sentenced Robert to seven years subject to NERA and three years of parole supervision upon release.

Iverson was sentenced to seventeen years subject to NERA followed by three years of parole supervision. The judge found aggravating factors three, six, and nine, N.J.S.A. 2C:44-1(a)(3), (6), and (9) applicable, and no mitigating factors.

Daiquan raises the following points on appeal:

> I. DESPITE IDENTIFICATION BEING A KEY ISSUE AT TRIAL, THE JUDGE FAILED TO CHARGE THE JURY THAT THE STATE MUST PROVE THE IDENTITY OF THE PERPETRATOR BEYOND A REASONABLE DOUBT. THE MISSING INSTRUCTION DEPRIVED [DAIQUAN] OF A FAIR TRIAL, REQUIRING REVERSAL.
>
> II. THE COURT ALSO FAILED TO GIVE THE REQUIRED JURY CHARGES REGARDING THE RELIABILITY OF EYEWITNESS IDENTIFICATION, IN A CASE THAT HINGED ALMOST ENTIRELY ON THE TESTIMONY OF ONE EYEWITNESS. REVERSAL IS REQUIRED.
>
> III. THE TRIAL WAS LITTERED WITH REFERENCES TO NONTESTIFYING WITNESSES WHO HAD PURPORTEDLY IDENTIFIED [DAIQUAN] AS THE SHOOTER. THESE REPEATED REFERENCES VIOLATED [DAIQUAN'S] RIGHT TO CONFRONTATION, AND THE JUDGE FURTHER ERRED IN REPLAYING THE STATEMENTS IN THEIR ENTIRETY. THIS RENDERED THE ENTIRE TRIAL UNFAIR, REQUIRING REVERSAL.
>
> > A. The right to confrontation is essential to a fair trial.

15

B. The playing and replaying of Carlson's full recorded interview violated the hearsay rules, [Daiquan's] right to confrontation, and was overly prejudicial.

C. The same Confrontation Clause violations also infected the playing and replaying of [Daiquan's] police interview.

IV. THE CUMULATIVE IMPACT OF THESE ERRORS DENIED [DAIQUAN] A FAIR TRIAL..

V. THE CONSECUTIVE SENTENCE, BASED UPON A MISAPPLICATION OF THE FACTS AND A MISUNDERSTANDING OF WHAT CONSTITUTES GUN POSSESSION UNDER THE LAW, IS MANIFESTLY EXCESSIVE.

Robert raises the following points on his appeal:

I. THE COURT ERRED IN DENYING [ROBERT'S] MOTION FOR ACQUITTAL BECAUSE THERE WAS NO PROOF THAT HE AGREED TO COMMIT AGGRAVATED ASSAULT, SERIOUS BODILY INJURY. ALTERNATIVELY, THE COURT ERRED IN DENYING [ROBERT'S] MOTION FOR A NEW TRIAL BECAUSE THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

A. A judgment of acquittal is required because, even construing the evidence in the light most favorable to the state, there was insufficient evidence to warrant a conviction.

B. Alternatively, Robert . . . is entitled to a new trial because the jury's verdict was plainly against the weight of the evidence.

16

A-1554-18

II.    THE COURT'S REFUSAL TO INSTRUCT THE JURY THAT MERE PRESENCE AT THE SCENE OF THE CRIME IS INSUFFICIENT TO SUPPORT A CONSPIRACY CONVICTION DEPRIVED [ROBERT] OF A FAIR TRIAL.

III.    IF AN ACQUITTAL OR A NEW TRIAL IS NOT GRANTED, THE MATTER MUST BE REMANDED FOR A RESENTENCING BECAUSE THE COURT ERRED IN FAILING TO FIND MITIGATING FACTOR SEVEN.

Iverson raises the following points on his appeal:

I.    THE TRIAL COURT'S ADMISSION OF THE STATEMENT OBTAINED FROM . . . IVERSON VIOLATED HIS CONSTITUTIONAL RIGHTS TO COUNSEL AND TO REMAIN SILENT.

II.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONSPIRACY CHARGE IN THIS CASE.

III.    THE COURT'S REFUSAL TO INSTRUCT THE JURY THAT MERE PRESENCE AT THE SCENE OF THE CRIME IS INSUFFICIENT TO SUPPORT A CONSPIRACY CONVICTION DEPRIVED . . . IVERSON OF A FAIR TRIAL.

IV.    . . . IVERSON'S SENTENCE WAS UNJUSTLY DISPARATE FROM THOSE OF HIS CO-DEFENDANTS.

V.    THE TRIAL COURT ABUSED ITS DISCRETION AND IMPOSED A MANIFESTLY EXCESSIVE SENTENCE.

17

We address the trial errors raised by each defendant in separate sections and will address the arguments they raise regarding their sentences together.

I.

Daiquan challenges the State's evidence identifying him as the shooter. He argues Reggie's identification testimony was not reliable because "Juanita was shot in the evening, in the dark, and Reggie . . . had never met any of the potential assailants until that day." He asserts Reggie and Govan provided inconsistent accounts of the clothing he was wearing the night of the incident. Although he did not request such an instruction, he contends the jury should have been instructed "that the State has the ultimate burden of proving the identity of the perpetrator beyond a reasonable doubt." He also argues the judge failed to instruct the jury regarding the reliability of Reggie's in-court identification, denying him the right to due process and a fair trial.

Daiquan also argues the prosecutor violated his right to confrontation by referring in her opening to unnamed non-testifying eyewitnesses who allegedly identified him as the shooter. He further argues the State violated the Confrontation Clause[7] by admitting Carlson's entire police interview over defense counsel's objection, as a prior inconsistent statement. He alleges

---

[7] U.S. Const. amend. VI; N.J. Const. art. I ¶ 10.

Carlson's interview was unduly prejudicial because it contained improper references to non-testifying witnesses who accused him of murder and an assertion that police had a warrant for his arrest. He claims the judge erred by not allowing the defense to cross-examine Carlson after her police interview video was played.

Daiquan also contends his police interview video was improperly admitted for similar reasons. He claims that during the interview, police made several references to unnamed witnesses who allegedly identified him as the shooter, which violated his right to confrontation.

Daiquan argues the cumulative effect of these errors warrants reversal of his convictions on due process grounds. We address these arguments in turn.

A.

"When a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard." State v. Singh, 245 N.J. 1, 13 (2021). This includes an unchallenged jury instruction. State v. Torres, 183 N.J. 554, 564 (2005).

The alleged error constitutes plain error if it was "clearly capable of producing an unjust result." Singh, 245 N.J. at 13 (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225

19

N.J. 66, 79 (2016). This standard "is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it might otherwise not have reached[.]'" State v. Alessi, 240 N.J. 501, 527 (2020) (quoting State v. Santamaria, 236 N.J. 390, 404 (2019); State v. Macon, 57 N.J. 325, 336 (1971)).

When defense counsel raises an objection at trial, the alleged error is reviewed under a harmless error standard. State v. Mohammed, 226 N.J. 71, 86 (2016). Under this standard, "[t]he question for the appellate court [is] simply whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." Id. at 86-87 (second and third alterations in original) (quoting Macon, 57 N.J. at 338). Like with plain error, the error must be "clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2).

"When identification is a 'key issue,' the trial court must instruct the jury on identification, even if a defendant does not make that request." State v. Cotto, 182 N.J. 316, 325 (2005). Identification is a key issue when "'[i]t [i]s the major . . . thrust of the defense,' particularly in cases where the State relies on a single victim-eyewitness . . . ." Id. at 325-26 (alterations in original) (quoting State v. Green, 86 N.J. 281, 291 (1981)) (internal citations omitted). Further, "[t]he

determination of plain error depends on the strength and quality of the State's corroborative evidence rather than on whether defendant's misidentification argument is convincing." Id. at 326 (citing State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003)).

At the outset, we note Daiquan did not request a jury charge on identification. Even so, the trial judge instructed the jury multiple times the State bore the burden to prove each element of the charges beyond a reasonable doubt and the burden did not shift to Daiquan. The judge also instructed the jury on witness credibility. The jury was free to accept or reject Reggie's testimony that Daiquan was the shooter based on his interaction with him earlier in the day.

We are unconvinced the absence of an identification instruction was plain error because the State's case was built upon several other items of evidence pointing to Daiquan as the shooter. Indeed, Govan's description of the men he saw in the street, including the shooter, matched Reggie's description of the clothing he said Daiquan was wearing when he fired the gun. Carlson's interview also corroborated Daiquan as the shooter based on her statement to police that Daiquan "shot once." Daiquan's Facebook message further

21

corroborated he was the shooter. Therefore, the lack of a detailed identification instruction was not error.

Defense counsel was able to cross-examine and attack the credibility of these witnesses, undermine the evidence, and addressed credibility in summation to the jury. For these reasons, we are unconvinced the jury charge constituted reversible error, or that the failure to give a specific charge on identification or reliability of witness identification was "clearly capable of producing an unjust result." See R. 2:10-2.

B.

"Prosecutors 'are afforded considerable leeway in making opening statements and summations.'" State v. Echols, 199 N.J. 344, 359-60 (2009) (quoting State v. Williams, 113 N.J. 393, 447 (1988)). Nevertheless, prosecutors "must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." Id. at 360 (quoting State v. Reddish, 181 N.J. 553, 641 (2004)) (alterations in original). "Reversal is justified when the prosecutor['s] . . . conduct was 'so egregious as to deprive defendant of a fair trial.'" Ibid. (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. Failure to make a timely objection indicates that the defense counsel did not believe the remarks were prejudicial at the time they were made." Ibid. (quoting State v. Timmendequas, 161 N.J. 515, 576 (1999)).

In her opening arguments, the prosecutor told the jury she planned to call two of Holley's neighbors who were sitting outside during the shooting. The prosecutor then described what the witnesses saw, which mirrored Govan's statement to police.

Our review of the record shows the prosecutor planned to call Govan and his wife, who Govan testified was sitting on his porch with him when the shooting occurred. Although the prosecutor mentioned a witness she did not ultimately call, we are unconvinced her comment created an unjust result or unduly prejudiced Daiquan because she did not state or infer the witness would identify Daiquan as the shooter. Moreover, Govan testified consistently with the prosecutor's description of his testimony and never identified Daiquan as the shooter. The defense cross-examined Govan on his statements, and although Weber testified to his interview with Govan and his wife, the defense cross-examined him. Furthermore, the trial judge sufficiently instructed the jury that

statements by attorneys were not evidence and could only consider the testimony and exhibits admitted into evidence.

C.

Our Supreme Court has stated that "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." State v. Branch, 182 N.J. 338, 350 (2005). "When evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict." State v. Weaver, 219 N.J. 131, 154 (2014). In other words, it "requir[es] a reviewing court 'to declare a belief that [the error] was harmless beyond a reasonable doubt.'" Ibid. (second alteration in original) (quoting Chapman v. California, 386 U.S. 18, 24 (1965)).

Carlson's recorded police interview was properly admitted as a prior inconsistent statement under N.J.R.E. 803(a)(1) after she denied at trial that Daiquan told admitted to her he shot once and that police pressured her during the interview to make that claim. At the Gross hearing, the judge considered Weber's testimony and defense counsel's objections to the statement's admission, and concluded Carlson's statement to police was voluntary,

uncoerced and reliable. We have no basis to second guess the trial judge's decision to admit the recording.

There was no confrontation clause violation because Carlson testified at trial, her police interview was available during her testimony, and she was subject to cross-examination. See State v. Burr, 392 N.J. Super. 538, 568-69 (App. Div. 2007) (finding no confrontation clause violation where a witness' videotaped statement was played for the jury after her testimony concluded).

Daiquan also challenges two statements in Carlson's recorded interview referencing statements from non-testifying witnesses. Carlson told police someone from the neighborhood told her "they're trying to say [Daiquan] killed somebody." She also stated she heard another person in the neighborhood state: "They saying that [Daiquan] killed somebody. That's crazy. That's crazy; right? That's crazy?"

Although the judge admitted Carlson's statement under N.J.R.E. 803(a)(1), he ruled the portion of the recording addressing whether Carlson had been arrested should be redacted, and asked both parties whether there were "any other particular statements contained within the recordings that . . . should not be played?" The defense did not object. Daiquan now argues defense counsel's overarching objection to the admission of Carlson's statement sufficed.

25

We discern no reversible error. A thorough review of Carlson's statement shows that immediately following the two statements, Carlson made clear she did not believe the individuals. The statements are part of the conversation where Carlson makes clear to police she did not see Daiquan kill anyone. Based on the context of the conversation, Carlson did not believe the statements and was not repeating them for their truth.

As noted, during openings both sides told the jury the only person who identified Daiquan as the shooter was Reggie. During summations, the parties again reminded the jury Reggie identified the shooter and allowed the jury to accept or reject his testimony. Therefore, the jury was not misled into believing that non-testifying witnesses identified Daiquan as the shooter.

Similarly, Daiquan argues the court erred by admitting his statement to police because it contained comments by police referencing witnesses who identified him as the shooter. Our Supreme Court has stated "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." State v. Bankston, 63 N.J. 263, 271 (1973); see also Branch, 182 N.J. at 350. However, police, "in the interrogation process may, by the officer's statements, make misrepresentations of fact or

suggest that evidence in the form of reports or witnesses exist that will implicate a suspect." State v. Patton, 362 N.J. Super. 16, 32 (App. Div. 2003).

We are unpersuaded the admission of this evidence constituted reversible error. Our review of the record shows police informed Daiquan there were witnesses who stated he had a gun and was the shooter. Their representations to Daiquan were consistent with the fact that: 1) Reggie identified Daiquan as having a gun and shooting Juanita; 2) Carlson's police interview and Daiquan's Facebook message to his girlfriend corroborated that he had a gun; and 3) Weber testified Reggie was the only individual who could identify Daiquan as the shooter. These facts established the jury was not led to believe there were any additional, non-testifying witnesses who could identify Daiquan as the shooter. Accordingly, we discern no reversible error.

## D.

Under the cumulative error doctrine, we may reverse a defendant's conviction when "any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet . . . all of them taken together justify the conclusion that defendant was not accorded a fair trial." State v. Terrell, 452 N.J. Super. 226, 308 (App. Div. 2016) (quoting State v. Orecchio, 16 N.J. 125,

134 (1954)). Because we reject Daiquan's claims of error, the cumulative error doctrine does not apply.

## II.

Both Robert and Iverson argue the trial judge erred by not granting their motions for acquittal and new trial on grounds of insufficient evidence to support a conspiracy to commit aggravated assault. Robert asserts there was no evidence showing he made statements, orchestrated the trip, confronted people at the scene, intended to harm Reggie, or knew Daiquan was carrying a gun. He argues, at best, the evidence shows he agreed to serve as back up for Daiquan in the event he faced more than one person during the confrontation and the jury relied upon inferences not reasonably based on the evidence to convict him. Iverson claims he merely drove one of the vehicles to Reggie's home and was not present during the shooting. Both Robert and Iverson argue the judge erred by refusing to instruct the jury that one's mere presence at the scene of the crime is insufficient to support a conspiracy conviction.

## A.

"In assessing the sufficiency of the evidence on an acquittal motion, we apply a de novo standard of review." State v. Williams, 218 N.J. 576, 593-94 (2014). When a defendant moves for acquittal following conclusion of the

A-1554-18

State's case the trial judge must determine whether "based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Id. at 594.

"In considering circumstantial evidence, we follow an approach 'of logic and common sense. When each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole, judgment of acquittal is not warranted.'" State v. Jones, 242 N.J. 156, 168 (2020) (alteration in original) (quoting State v. Samuels, 189 N.J. 236, 246 (2007)).

A trial judge may grant a defendant a new trial "if required in the interest of justice." R. 3:20-1. A motion for a new trial is subject to the trial judge's discretion and we will not reverse unless such discretion was abused. State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016). The motion is considered "in light of the credible evidence and with deference to the trial judge's feel for the case and observation of witnesses." Terrell, 452 N.J. Super. at 268-69 (citing State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004)). "The jury verdict will be upheld where there is sufficient evidence to support the conviction on [the] charge." Id. at 269 (citing State v. Muhammad, 182 N.J. 551, 578 (2005)).

"The trial judge's ruling 'shall not be reversed unless it clearly appears there was a miscarriage of justice under the law.'" State v. Gaikwad, 349 N.J. Super. 62, 82 (App. Div. 2002) (quoting R. 2:10-1). "There is no 'miscarriage of justice' when 'any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" State v. Jackson, 211 N.J. 394, 413-14 (2012) (quoting State v. Afanador, 134 N.J. 162, 178 (1993)).

Pursuant to N.J.S.A. 2C:5-2(a)(2), a person commits the offense of conspiracy provides if they "[a]gree[] to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime." "[T]he essence of conspiracy is the illegal agreement and not the specific crime which is the object of conspiracy." State v. Soltys, 270 N.J. Super. 182, 186 (App. Div. 1994). "Thus, under the Code[8] 'the major basis of conspiratorial liability [is] the unequivocal evidence of a firm purpose to commit a crime' that is provided by the agreement." Samuels, 189 N.J. at 245 (alteration in original) (quoting State v. Roldan, 314 N.J. Super. 173, 181 (App. Div. 1998)).

---

8 The Code of Criminal Justice N.J.S.A. 2C:1-1 to :104-9.

Conspiracy may be proven with circumstantial evidence because the conduct and words of co-conspirators are usually shrouded in "silence, furtiveness, and secrecy[.]" Id. at 246 (quoting State v. Phelps, 96 N.J. 500, 509 (1984)). "An implicit or tacit agreement may be inferred from the facts and circumstances." State v. Kamienski, 254 N.J. Super. 75, 94 (App. Div. 1992). Moreover, "[t]he mere knowledge, acquiescence, or approval of the substantive offense, without an agreement to cooperate, is not enough to establish one as a participant in a conspiracy." State v. Abrams, 256 N.J. Super. 390, 401 (App. Div. 1992). "There must be intentional participation in the activity with a goal of furthering the common purpose; mere association is inadequate." Ibid.

Pursuant to these principles, we conclude the trial judge did not err in denying Robert and Iverson's motions for acquittal and a new trial. The State presented sufficient circumstantial evidence, meeting the elements under N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:12-1(b)(1). The record shows both men agreed to and did accompany Daiquan to Reggie's home. Indeed, Carlson testified the group agreed to go back to Reggie's before she arrived at the Iverson's later in the evening, and the group was still talking about the day's earlier events when she arrived. Carlson said she did not see a gun in her car, leading the jury to deduce Robert and Iverson brought the gun in the minivan.

31

Her testimony also proved the group's purpose in returning to the Holley residence for Daiquan to fight.

Robert's conduct at the shooting allowed the jury to conclude there was an agreement because Govan and Reggie testified seeing Robert walk down the street with Daiquan, and both saw him in the street during the shooting. Govan and Reggie saw the men acting furtively. The jury could also deduce the group's target was Reggie because they stayed at the house even after they found out Sharpe was not there. Robert's actions following the incident also established his participation in the conspiracy because he returned to the minivan and called Carlson three times rather than fleeing.

Likewise, Iverson not only drove Daiquan to the Holley residence, he waited in the van during the shooting. The State presented evidence Iverson was in constant communication with Hyshonna, who was with Daiquan and Carlson outside the Holley residence. After the shooting, Iverson drove Daiquan and Robert away and later rendezvoused with Carlson for Daiquan to switch vehicles. The jury could infer Iverson and Robert disposed of the gun because Daiquan switched cars and entered Carlson's vehicle without a gun. Carlson also saw Iverson turn in a different direction to go home and arrived at the house after she did. See State v. Savage, 172 N.J. 374, 405 (2002) ("a conspiracy may

continue beyond the actual commission of its objective if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled in order to avoid apprehension.").

There was ample evidence tying Robert and Iverson to the crime and therefore no grounds to grant either of them an acquittal. Our Supreme Court has found "no manifest denial of justice in the trial court's refusal to set aside [a jury] verdict" where "the defendant was not entitled to an acquittal at the close of the State's case . . . ." State v. Perez, 177 N.J. 540, 555 (2003). The trial judge properly found "[t]here was sufficient evidence the jury could find from the evidence, and infer that there was an agreement, and that the agreement was to commit an aggravated assault." For these reasons the jury verdict did not represent a miscarriage of justice to warrant a new trial.

## B.

"When an appellate court reviews jury instructions, the court must examine the challenged language in the context of the entire charge." State v. Simon, 161 N.J. 416, 477 (1999). "[I]nsofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury." State v. R.B., 183 N.J. 308, 325 (2005).

At the charge conference, Robert's counsel requested the trial judge instruct the jury that his mere presence at the scene was not grounds to convict him on conspiracy to commit aggravated assault. Iverson did not join in the request. The trial judge declined to deviate from the model jury charge, noting familial relationships were insufficient grounds to establish a conspiracy.

The trial judge did not err. Neither Robert nor Iverson were charged with accomplice liability. Therefore, the presence of either defendant on scene was not necessary for the State to prove a conspiracy. Rather, as indicated in the model charge read to the jury "[f]or [a defendant] to be found guilty of conspiracy, the State has to prove beyond a reasonable doubt that when he agreed it was his conscious object or purpose to promote or make it easier to commit the crime of [a]ggravated [a]ssault serious bodily injury." The evidence adduced showed Robert and Iverson were not merely present but agreed to company Daiquan to Reggie's home for a confrontation and Iverson agreed to provide the transportation. Once on scene, Robert and Iverson each played a role in facilitating the crime. For these reasons, there was no rational basis to give the mere presence instruction in either defendant's case.

## III.

Iverson argues the trial judge erred by admitting his statements to police because they questioned him after he asked if he should have an attorney present. He argues police never answered his question and manipulated him into making uncounseled admissions. He also argues his statement was not voluntary because police tricked him into believing he was not a suspect and downplayed his right to remain silent.

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). "Thus, appellate courts should reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2014) (internal quotation marks omitted) (quoting State v. Elders, 192 N.J. 224, 244 (2007)).

We affirm the decision denying Iverson's suppression motion for the reasons expressed by the trial judge. Iverson's arguments lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2).

IV.

Finally, we address each defendant's arguments regarding sentencing. Sentencing decisions are discretionary in nature. State v. Cuff, 239 N.J. 321, 347 (2019). For these reasons, we review sentencing determinations for an abuse of discretion. State v. Jones, 232 N.J. 308, 318 (2018). We defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014). However, our deference applies "only if the trial judge follows the Code and the basic precepts that channel sentencing discretion." State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting Case, 220 N.J. at 65). "To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence." Case, 220 N.J. at 65. Moreover, when deciding to impose concurrent or consecutive sentences, trial judges must consider the guidelines set in Yarbough, 100 N.J. at 627.

A.

Daiquan argues the sentencing judge should not have imposed a consecutive sentence for the manslaughter and unlawful gun possession offenses. He argues the offenses "had the same objective, there was only one threat or use of violence, the crimes were committed at the same place and time, there were not multiple victims, . . . there were not numerous convictions . . .

36

[and constituted] the same course of conduct." He claims the judge failed to consider each <u>Yarbough</u> factor weighing in his favor. He argues he was convicted of possession of an unlawful weapon despite the fact thinking about getting a gun is not in itself a crime. He asserts there was no evidence showing he possessed a gun at any point before the shooting.

During the pendency of Daiquan's appeal, the State filed a letter seeking a remand for findings regarding the overall fairness of his sentence pursuant to <u>State v. Torres</u>, 246 N.J. 246 (2021). In <u>Torres</u>, the Court held:

> An explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding . . . is essential to a proper <u>Yarbough</u> sentencing assessment. . . . Acknowledging and explaining the fairness of the overall sentence imposed on the defendant advances critical sentencing policies of the Code, as amplified by <u>Yarbough</u>.
>
> [<u>Id.</u> at 268.]

Daiquan does not dispute there should be a remand pursuant to <u>Torres</u> but argues it should be for resentencing and reassessment of the aggravating and mitigating factors, including newly enacted mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14). The State disagrees and argues the remand should be limited to a re-assessment of the <u>Yarbough</u> factors.

We remand for resentencing because Torres requires the sentencing judge conduct a fairness assessment of the "overall sentence imposed on the defendant [to] advance[] critical sentencing polices of the Code[.]" Ibid. The sentencing policies of the code are not limited to the Yarbough factors because the Torres Court said those policies were "amplified by Yarbough." Ibid. In our view, this requires consideration of all the aggravating and mitigating factors at the time the court considers the "overall sentence." In State v. Bellamy, 468 N.J. Super. 29, 39 (App. Div. 2021) we stated: "When an appellate court orders a resentencing, a defendant is ordinarily entitled to a full rehearing." For these reasons, the trial judge should resentence Daiquan and consider the aggravating and mitigating factors, including mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14). Because we remand for resentencing, we do not reach the remaining sentencing arguments raised by Daiquan.

B.

Robert argues the judge erred in failing to find mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), "[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense[,]" despite rejecting aggravating factor six, N.J.S.A. 2C:44-1(a)(6), "[t]he extent of the defendant's prior criminal

record and the seriousness of the offenses of which the defendant has been convicted[.]" He asserts the judge focused on his anger issues rather than consider his lack of a criminal record. He argues his sentence would be shorter if the judge found the mitigating factor because it would outweigh the aggravating factors. Robert also argues the judge failed to consider that he was under twenty-six years of age at the time of the offense and thus we should remand for consideration of mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14).

"When a court weighs aggravating and mitigating factors, the judge exercises 'a far-ranging discretion as to the sources and types of evidence used to assist him or her in determining the kind and extent of punishment to be imposed.'" State v. Tillery, 238 N.J. 293, 325 (2019) (quoting State v. Davis, 96 N.J. 611, 619-20 (1984)). "[T]he finding of any factor must be supported by competent, credible evidence in the record." Id. (quoting Case, 220 N.J. at 64).

Robert's record contained five juvenile arrests and nine adult arrests. None of the adult arrests resulted in a criminal conviction. For these reasons aggravating factor six did not apply. However, the trial judge properly declined to apply mitigating factor seven because Robert's record showed he did not lead a law-abiding life. The judge's discussion of Robert's anger does not prove the

39

A-1554-18

judge erred by not applying mitigating factor six; the judge was simply explaining the cause of Robert's many run-ins with the law.

Robert's sentencing took place in January 2019 before the Legislature enacted N.J.S.A. 2C:44-1(b)(14), which became effective October 19, 2020. The new mitigating factor is inapplicable because we have affirmed the sentence. See Bellamy, 468 N.J. Super. at 39. Notwithstanding the new mitigating factor, we are unconvinced Robert's youth would have resulted in a different sentence. Considering Robert faced a maximum sentence of ten years with a maximum eight-and-a-half years of parole ineligibility, his seven-year sentence does not shock the judicial conscience. See Tillery, 238 N.J. at 323.

C.

Iverson argues his sentence was excessive and disparate from the other defendants who were more culpable. He reiterates he merely drove the vehicle to the scene. He argues the judge punished him with an extended term for failing to control his adult sons, yet the judge's belief that he had such control was conjectural. He asserts the judge considered prior convictions that were too remote and for lesser offenses.

Iverson also argues the judge did not give reasons for imposing aggravating factor three, N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant

will commit another offense" and relied only on his prior history to find aggravating factor N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and other from violating the law[.]" He asserts the judge should have found mitigating factors two, five, and eight, N.J.S.A. 2C:44-1(b)(2), (5), and (8), "[t]he defendant did not contemplate that [his] conduct would cause or threaten serious harm; . . . [t]he victim of the defendant's conduct induced or facilitated its commission; . . . [t]he defendant's conduct was the result of circumstances unlike to recur."

At sentencing Iverson conceded the applicability of aggravating factors three, six, and nine. Notwithstanding Iverson's stipulation, the trial judge noted he had a lengthy record of juvenile arrests and adjudications, disorderly persons and indictable convictions, violations of probation (VOP), and several arrests in Delaware, which included felony and VOP. The judge explained Iverson was on probation when he conspired with Daiquan and the others to commit the aggravated assault and that the "full array of criminal sanctions, including diversion, probation and incarceration, [did not] dissuade[] him from continued anti-social behavior." Further, the jury's guilty finding supported the sentence because Iverson did not play a minor role in committing the offense and instead was an active participant in the conspiracy by agreeing to drive his sons to the

41

Holley residence and wait while Daiquan committed the crime. The judge's findings supported application of aggravating factors three, six, and nine and did not support any mitigating factors.

We reject Iverson's assertion his sentence was disparately harsher than the other defendants. As the judge noted, Iverson's long criminal history showed he was a persistent offender and was extended term eligible pursuant to N.J.S.A. 2C:44-3(a). The Court has stated: "[A] sentence of one defendant not otherwise excessive is not erroneous merely because a codefendant's sentence is lighter." State v. Hicks, 54 N.J. 390, 391 (1969). Neither is a defendant's sentence necessarily manifestly excessive if his sentence is more severe than that of his or her co-defendant. State v. Tyson, 43 N.J. 411, 417 (1964) (citing State v. Gentile, 41 N.J. 58, 59-60 (1963)). For these reasons, we find no reversible error in Iverson's sentence.

Affirmed in A-1554-18 as to the convictions and remanded for resentencing, and affirmed in A-2739-18 and A-3183-18. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION